UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROBERT LEE BAILEY,

       Plaintiff,

                            Case No. 2:07-CV-115

v.

                            HON. ROBERT HOLMES BELL

CHRISTOPHER GOLLADAY, et al.,

       Defendants.
                                                /

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter came before the court for a bench trial on Plaintiff's claim that Defendant Corrections Officers violated his Eighth Amendment right to be free from cruel and unusual punishment. For the reasons that follow, judgment will be entered in favor of Defendants.

I.

BACKGROUND

On January 14, 2006, Plaintiff initiated an assault against Officer Golladay in Round Unit at the Chippewa Correctional Facility, which precipitated a much larger disturbance involving multiple prisoners. A duress call was sounded, and officers responded from various areas of the prison. Following the incident, four corrections officers were treated for injuries, four prisoners were escorted to segregation (Plaintiff Robert Lee Bailey, Andre Freeman, Frederick Ross, and Aubrey Stanley), and several other prisoners received misconduct tickets for failure to disperse. Plaintiff was ultimately convicted by jury of

Assault of a Prison Employee for his assault on Officer Golladay.

Defendants Storey, Forrest, Duvall, and Mahar were among the many officers who responded to the incident. Defendants assisted in restraining Plaintiff, rolling him over, and placing handcuffs and leg restraints on him. Defendants restrained Plaintiff on the floor of Round Unit until they escorted Plaintiff from Round Unit to segregation.

While in segregation, staff observed Plaintiff lying on the floor of the shower. He was shaking and his limbs were mildly jerking. The MDOC nurse suspected that Plaintiff might be suffering a seizure, and had him transported to War Memorial hospital for evaluation. The evaluation revealed multiple contusions. X'rays of Plaintiff's jaw, right hand and left wrist were all negative. The CT scan of Plaintiff's head showed no acute findings. Plaintiff was discharged with instructions to treat his injuries with rest, ice, elevation, and Tylenol.

The Court's initial summary judgment ruling in favor of Defendants was affirmed in part and reversed in part on appeal. (Dkt. No. 113, *Bailey v. Golladay*, No. 09-2411 (6th Cir. May 3, 2011)(unpublished opinion).) The Sixth Circuit affirmed the entry of summary judgment in favor of Defendants Golladay, Forrest, Mahar, Storey, and Duvall on the force used to bring Plaintiff Robert Lee Bailey under control. The Sixth Circuit agreed with this Court that, to the extent the corrections officers used force to subdue and restrain Bailey, the force was used in a good faith effort to maintain discipline, and the corrections officers only used as much force as was necessary and reasonably calculated to respond to the perceived threat. (*Id.* at 6-7.) However, the Sixth Circuit noted that this Court had failed to address

Bailey's allegations that his Eighth Amendment rights were violated by Defendants Duvall, Storey, Forrest, and an unnamed officer after Bailey was restrained and as he was being transported to the shower in the segregation unit. The Sixth Circuit noted that there was a factual dispute as to whether Defendants intentionally and repeatedly banged Bailey's head into the steel entrance to the segregation unit, as alleged by Bailey. The Sixth Circuit accordingly remanded the case for trial on the single issue of whether Defendants Duvall, Story, Forrest and the unnamed officer were due qualified immunity for the actions taken while transporting Bailey to the segregation unit after Bailey was restrained and had become cooperative. (*Id.*)

Plaintiff's complaint identified Defendant Mahar as a participant in the original scuffle, but did not identify him as the fourth individual who escorted him to segregation. At trial, Defendant Mahar admitted that he was the unnamed officer involved in transporting Plaintiff from Round Unit to segregation. Although Plaintiff never moved to amend his complaint to substitute Mahar for the unidentified fourth individual, for purposes of this opinion, the Court will assume that Mahar remained a party to this action on remand, and that he is the previously unidentified individual who Plaintiff alleges escorted him to segregation.

On March 7-8, 2012, this Court conducted a non-jury trial of this matter. After a careful review of the testimony and the documentary evidence introduced at trial, the Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

3

## II.

## FINDINGS OF FACT

Plaintiff Robert Bailey was at all times relevant to this suit an inmate incarcerated within the Michigan Department of Corrections for Second Degree Murder. He was housed in a cell on D-Wing of Round Unit at the Chippewa Correctional Facility.

Defendants Storey, Forrest, Duvall, and Mahar are corrections officers employed by the Michigan Department of Corrections.

On January 14, 2006, Plaintiff initiated an assault against Officer Golladay in Plaintiff's cell, which precipitated a much larger disturbance involving multiple prisoners. A duress call was sounded, and officers responded from many various areas of the prison. Defendants Storey, Forrest, Duvall, and Mahar were among the many officers who responded to the disturbance. When they arrived, Officer Golladay was lying on top of Plaintiff in the hallway. Defendants assisted in restraining Plaintiff, rolling him over, and placing handcuffs and leg restraints on him. Meanwhile, other officers were restraining other prisoners on the floor of D-Wing.

The disturbance and the officers' response were recorded on a stationary camera in the D-Wing hallway of Round Unit, and on a handheld video camera operated by Officer Mark E. Mattson. (Def. Ex. A, Critical Incident Rpt. 152.) Mattson reported that he remained in Round Unit until prisoner Stanley was escorted to Steamboat. (*Id*.).

Plaintiff testified that while he was on the ground, subdued and in restraints, Golladay

4

punched him several times in his face, and when he turned his head to ward off the attack, Defendant Mahar kicked him in the side of the head twice, and Defendant Duvall punched him in the stomach. Aubrey Giles Stanley, Jr., another inmate who was involved in the disturbance, similarly testified that while he and Plaintiff were lying on the floor of Round Unit in restraints, he saw someone kicking Plaintiff in the head, face, and arm. He did not recall how many times Plaintiff was kicked, and he did not recall the name of the officer who assaulted Plaintiff.

Defendant Mahar has worked at the MDOC for seventeen years. He testified that he did not assault, punch or kick Plaintiff while he was on the ground. Defendant Duvall has also worked at the MDOC for seventeen years. Defendant Duvall testified that while he was attempting to subdue Plaintiff, he struck Plaintiff several times with his knee in the thigh area (common peroneal strikes) as he was trained to do. However, he testified that once the restraints were applied, he did not strike Plaintiff, and did not see anyone else strike him.

The testimony that Plaintiff was assaulted while he was being restrained on the floor of Round Unit is not credible. Stanley's testimony was not credible because he not able to give any detail about the alleged assault. Plaintiff's testimony is not credible because there is no evidence on either the stationary or the handheld video recording that Plaintiff was assaulted after he was restrained. While the videos were not able to capture all of the activity relating to all four of the prisoners who were being restrained on the floor, the videos do reflect that once the prisoners were restrained, all of the officers acted calmly, unemotionally,

5

and professionally. The uniformity of their response reflects their training in responding to disturbances of this nature. Moreover, Plaintiff's testimony about being assaulted by Duvall and Mahar is contradicted by the grievance Plaintiff filed on February 10, 2006. In that grievance, Plaintiff alleged that Officers Duvall and Mahar "stood by and did nothing to attempt to stop Officer Golladay from punching me," and that other unknown officers punched him and kneed him in the body and kicked him in the face. (Def. Ex. B, Grievance 186-87.)

After the four inmates were restrained and the other inmates had dispersed, Sgt. Burke ordered the four inmates to be escorted, one at a time, to segregation in Steamboat Unit. Inmate Andre Freeman was involved in the disturbance, and was the first of the four prisoners to be escorted to segregation. Freeman received a misconduct ticket and was found guilty for his role in the disturbance. Inmate Frederick Ross was the second of the four prisoners to be escorted to segregation. Ross received a misconduct ticked for assault and his security level was raised as a result of his participation in the disturbance. Plaintiff was the third inmate to be escorted to segregation. Stanley was the fourth inmate escorted to segregation. Stanley received a criminal conviction for assault on a prison employee for his role in the disturbance.

Sgt. Burke directed the manner and order in which the prisoners were to be escorted from Round Unit to segregation. All of the inmates were transported to segregation in the same manner. Each inmate, with his hands handcuffed behind him and his legs in shackles,

6

was bent over at their waist and walked backwards. Two officers held the inmate's arms, and two officers held the inmate's head down. The officers have been trained to use this transport position to keep resisting prisoners off balance and to prevent prisoners from spitting on the officers.

Plaintiff testified that while he was being transported to segregation, Defendants Duvall and Mahar were holding his arms and Defendants Forrest and Storey were holding his head down. Plaintiff testified that Defendants Forrest and Storey used racial slurs against him, telling him "We're going to kill you nigger." Plaintiff testified that as they entered the segregation unit, Defendants Forrest and Storey grabbed his head and pounded it against the steel door frame. Plaintiff testified that the four Defendants threw him into the shower in handcuffs that were too tight, and left him lying on the shower floor in agonizing pain for an hour and a half before he was taken to the hospital.

Plaintiff testified that all of these actions were captured on a handheld video camera that followed him to segregation and that Defendants have refused to produce the video because it would verify Plaintiff's claim that he was assaulted at the entryway to Steamboat Unit. Plaintiff testified that although he did not see the handheld video, he knows there was one because there was a video of every prisoner going to segregation. Freeman and Ross, the first and second prisoners escorted to segregation, testified that a handheld camera followed them to segregation. Freeman testified that someone with a video also followed Plaintiff into segregation. Defendant Storey, Mahar and Duvall all testified that no camera

7

followed them during the escort.

Plaintiff's testimony that he was followed by a video camera is not supported by the evidence at trial. There is only one handheld video camera referenced in the Critical Incident Report. Sergeant Gravelle reported that he instructed RUO Mattson to report to D-Wing with the video camera . (Def. Ex. A, Crit. Inc. Rpt. 118). RUO Mattson stated in his report that he operated the hand held camera in Round Unit. (Def. Ex. A, Crit. Inc. Rpt. 152.) The statements in the Critical Incident Report are consistent with the video recording from the stationary camera on D-Wing of Round Unit, which showed only one handheld video camera being used. The Court finds that only one handheld video camera was used, and that it did not follow the first three prisoners as they were escorted to segregation. The handheld video camera only followed the last of the prisoners to segregation.

Prisoner Rodgerick Booth was housed in segregation on the night of the disturbance. Booth testified that from his cell he was able to see the entrance to the building. Booth testified that he saw Plaintiff being dragged through the door into segregation, and that he saw Plaintiff's head being punched and bumped up against the wall and the doors before Plaintiff was dragged down to the shower.

Booth's testimony that he saw officers bang Plaintiff's head into the door frame is not credible. The video footage of the segregation unit shows that it would not have been possible to see the entryway from a cell. In addition, Booth testified that he did not know that anyone else had been escorted into segregation. Had Booth seen and heard Plaintiff at

8

the entryway into the Steamboat Unit, he would also have been aware of the other three prisoners who were escorted there.

Freeman testified that when Plaintiff arrived at segregation, Defendant Forrest had his hands around Plaintiff's neck, the officers were choking Plaintiff, and he heard Plaintiff say he was unable to breathe. He further testified that Plaintiff's face was red and he was bruised, battered, and beat up. Ross testified that when Plaintiff arrived at segregation he was disoriented, his face was bruised, and he complained that his handcuffs were too tight.

Defendant Storey has worked as a correctional officer for eleven and a half years. Defendant Storey was trained to respond to prisoner assaults. Prior to the January 14 incident, he did not know Plaintiff. He was in the chow hall when he heard the duress call. He responded immediately. Defendant Storey testified that he does not take it personally when he is required to respond to prisoner assaults. When he arrived at Round Unit he saw four prisoners and many officers on the floor wrestling around. He went to the prisoner farthest down the hall because he knew other officers were following him. He helped to subdue Plaintiff and held him until they escorted Plaintiff to segregation. Defendant Storey testified that Plaintiff did not resist their efforts to escort him, and that neither he nor any of the other officers choked Plaintiff, used racial slurs against him, or banged Plaintiff's head against the steel door structure.

Defendant Forrest has worked for the MDOC for thirteen years. Defendant Forrest similarly testified that neither he nor any of the other officers choked Plaintiff, used racial

9

slurs against him, or banged Plaintiff's head against the steel door structure. Defendant Duvall testified that there was no incident during transport. Defendant Duvall made a note in his report that Plaintiff was escorted to Steamboat Unit "without further incident." ( Def. Ex. A, Crit. Inc. Rpt. 140.) He testified that he did not hear Plaintiff voice any complaints, and he did not see any physical injuries.

Defendants did not bang the plaintiff's head against a steel dividing structure during the escort from Round Unit to segregation. The officers' testimony on this issue was far more credible than Plaintiff's testimony. Plaintiff gave inconsistent testimony as to which side of his head was battered against the door. The Defendant Officers' testimony was consistent with the report of Sgt. Gravelle, who supervised the placing of the prisoners in cells in Steamboat, and stated that it "went without incident." (Def. Ex. A, Crit. Inc. Rpt. 118). Defendants Storey, Forrest, Duvall, and Mahar are all experienced corrections officers. As shown in the video recordings, their conduct while on D-Wing was professional. They responded to the incident in the manner in which they had been trained. None of these officers had a personal quarrel with Plaintiff. Storey did not even know him before this incident. There is no reason to believe that any of these officers would have deliberately banged Plaintiff's head against the steel door structure. Even if the plaintiff's head contacted the steel dividing structure during the escort into segregation, the Court finds that such contact was unintentional on the part of Defendants.

Neither did Defendants choke Plaintiff, use racial slurs against him, or otherwise

10

assault him during the escort from Round Unit to segregation. Plaintiff's head was held down in the transport position for a resisting prisoner according to the officers' training. Defendants did not use racial slurs or otherwise assault Plaintiff during the escort from Round Unit to segregation. At all relevant times, Defendants acted professionally, without anger or retaliatory motive, and in accordance with their training.

Plaintiff's testimony regarding the nature of his injuries also lacks credibility. According to Plaintiff, he sustained injuries to his head and face, cuts on his wrists, anxiety, headaches and nerve damage to his left eye that caused his eye to twitch. Plaintiff testified that after the incident on January 14, 2006, he continued to complain of pain in his hand, wrist, head, and back. (*See* Kites dated 1/30/06, 2/9/06, 6/28/06. Pl. Ex. 5, pp. 39, 40, 47.)

Plaintiff did not suffer any serious or lasting injury. Plaintiff was examined at War Memorial Hospital on the night of January 14, 2006, within hours of the disturbance. The CT scan of Plaintiff's head showed:

> Mild streak artifacts at the level of the inferior frontal lobes. No acute intracranial hemorrhage, acute territorial infarct, mass effect, midline shift, or hydrocephalus. Visualized sinuses and mastoid air cells are clear. Calvarium and skull base are intact. No acute findings of the visualized bilateral globes.

(Def. Ex. D, at 212.) The summary of the report was "No acute findings." (*Id.*) Plaintiff was diagnosed with multiple contusions, and discharged from the hospital at 1:00 a.m. with instructions for rest, ice, elevation, and Tylenol. (Def. Ex. D, at 206, 208.)

Plaintiff's testimony that he suffered all of these injuries after he was restrained rather than during his fight with Officer Golladay, during the officers' efforts to restrain him, or as

a result of previous incidents is not credible. Plaintiff's injuries are consistent with the force used against him prior to his being restrained. Christopher James Golladay, who has worked as a correctional officer for eleven years, testified that when Plaintiff assaulted him he punched Plaintiff anywhere he could hit him, including in the stomach, neck, and head. Even after he and Plaintiff fell to the ground, Plaintiff continued to resist until several officers helped to roll him over and put handcuffs on him.

Plaintiff contends that the Court should not believe Golladay's testimony because Golladay's critical incident report and misconduct ticket did not mention striking Plaintiff in the face or head. Golladay's Critical Incident Participant Report and Major Misconduct Report focus on what Plaintiff did. Neither of these documents detail the force Golladay used in response. (Def. Ex. A, Crit. Inc. Rpt. 105, 164.) Neither of these documents is inconsistent with Golladay's testimony at trial. Golladay's testimony was credible. Any injuries Plaintiff suffered are consistent with the actions taken by the Golladay and other responding officers to restrain Plaintiff after Plaintiff assaulted Golladay.

Plaintiff's testimony, conduct, and argument throughout this case displayed a lack of all credibility. On the video recording of Plaintiff's removal from his cell for transport to the hospital, Plaintiff acted as though he were barely conscious, but then deliberately turned to display his injuries to the camera. On his return from the hospital, Plaintiff was able to balance on one foot as he changed his clothes, and his eyes were sharp. During trial, Plaintiff complained that he did not know how to proceed in court, but then shrewdly attempted to

12

force the Court to commit itself on issues of evidence. Plaintiff clearly prepared his witnesses to provide false evidence to support his case. Plaintiff also omitted portions of his medical record that were inconsistent with his trial testimony concerning the severity of the injuries allegedly caused by Defendants. It is with considerable sadness that this Court concludes that this is a manufactured case.

## III.

## CONCLUSIONS OF LAW

The Court applies the relevant law outlined by the Sixth Circuit:

> The Eighth Amendment prohibits "the unnecessary and wanton infliction of pain against prisoners." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "Although prison discipline may require that inmates endure relatively greater physical contact, the Eighth Amendment is nonetheless violated if the 'offending conduct reflects an unnecessary and wanton infliction of pain.'" *Id*. at 383 (quoting *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995)).
>
> The prisoner must satisfy both an objective and a subjective component with respect to this inquiry. *Id*. at 383. In the context of a prison disturbance, the analysis "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley*, 475 U.S. at 320-21). This showing will satisfy the subjective component required for a claim under the Eighth Amendment. *Williams*, 631 F.3d at 383. To make this determination, the court may "evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7 (citing *Whitley*, 475 U.S. at 321) (internal quotations omitted). The objective component requires "the pain inflicted to be sufficiently serious." *Williams*, 631 F.3d at 383 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). However, the seriousness of the injuries is not dispositive. *Id*. This is a "contextual" inquiry that is "responsive to contemporary standards of

decency." *Id*. (quoting *Hudson*, 503 U.S. at 8-9).

(Dkt. No. 103, *Bailey v. Golladay*, No. 09-2411, slip op. (6th Cir. May 3, 2011).)

The evidence presented at trial does not satisfy either the subjective or the objective component of an Eighth Amendment excessive force claim. The force applied by Defendants to keep Plaintiff restrained on the floor of Round Unit, and then to escort him to segregation was applied in a good faith effort to restore and maintain discipline. Defendants did not unnecessarily and wantonly inflict pain, nor did they use force maliciously and sadistically for the very purpose of causing harm. In addition, any pain or injuries caused by the manner in which Defendants restrained Plaintiff and transported him to segregation was not sufficiently serious. The Court concludes that Defendants did not violate Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Defendants are accordingly entitled to judgment.

A judgment consistent with this opinion will be entered.


Dated: July 27, 2012                              /s/ Robert Holmes Bell
                                                  ROBERT HOLMES BELL
                                                  UNITED STATES DISTRICT JUDGE